151 WEST ASSOCIATES, Respondent-Appellant, v PRINT-SIPLES FABRIC CORP., Respondent, and FUTTERMAN-SCHLANG INDUSTRIES, LTD., Appellant-Respondent.

First Department, March 3, 1983

**APPEARANCES OF COUNSEL**

*Steven S. Fass* for respondent-appellant.

*Robert W. Corcoran* of counsel (*Speno, Goldberg, Moore, Margules & Corcoran, P. C.*, attorneys), for appellant-respondent.

*Michael B. Goldsmith* of counsel (*Silverberg, Stonehill & Goldsmith, P. C.*, attorneys), for respondent.

**OPINION OF THE COURT**

MILONAS, J.

On September 9, 1975, defendant-respondent Printsiples Fabric Corp. entered into a lease with plaintiff-appellant 151 West Associates for a term of 10 years ending on September 30, 1985. Pursuant to this agreement, Printsiples rented the 16th floor at 151 West 40th Street in

Manhattan. On August 1, 1978, Printsiples, with the permission of the landlord, sublet these premises to defendant-respondent Futterman-Schlang Industries, Ltd. One of the provisions of the main lease, whose interpretation is in dispute here, states that: "Bankruptcy: 16. (a) If at the date fixed as the commencement of the term of this lease or if at any time during the term hereby demised there shall be filed by or against Tenant in any court pursuant to any statute either of the United States or of any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property, and within 60 days thereof, Tenant fails to secure a dismissal thereof, or if Tenant make an assignment for the benefit of creditors or petition for or enter into an arrangement, this lease, at the option of Landlord, exercised within a reasonable time after notice of the happening of any one or more of such events, may be cancelled and terminated by written notice to the Tenant".

Plaintiff asserts that in the spring of 1980, it became evident that Printsiples was experiencing financial difficulties, that its unsecured trade debt amounted to some $3,000,000, and that, as a result of problems in paying its bills, a creditor's committee had been formed. However, prior to any liquidation taking place, the committee was approached by a third party, Norcnote Associates, which proposed to purchase, under specified conditions, the claims of the unsecured creditors. Accordingly, on April 30, 1980, an agreement was executed whereby Norcnote accepted an assignment of the creditors' claims against Printsiples. Printsiples for its part, consented to the terms of the agreement. Subsequently, the shareholders of Printsiples transferred their stock to Norcnote. By notice dated July 8, 1980, the landlord advised defendants of its decision to cancel and terminate the lease pursuant to the "Bankruptcy" clause, paragraph 16(a). The instant ejectment action ensued, and both the landlord and subtenant appeal from Special Term's denial of their respective motions for summary judgment.

The so-called "arrangement" which is the basis of the landlord's determination to invoke paragraph 16(a) is founded on an agreement between Norcnote and the credi-

tors of Printsiples. The agreement did not settle, discharge or reduce Printsiples' debt, nor did it alter the terms for payment in any way. Rather, the creditors, upon certain specified terms, which included the payment by Norcnote of 16½% of unsecured obligations up to $4,000,000, assigned their claims to a third party, Norcnote, thus substituting a new creditor for the previous ones. Printsiples signed the instrument to acknowledge its consent to the agreement. Printsiples then transferred its stock to Norcnote. Consequently, the debtor continues to exist, its functions remain in operation, and, as in many corporate acquisitions, some of Printsiples' management has been retained. It now simply has new shareholders. This transaction may, in its entirety, simply be viewed as the acquisition of one corporation, Printsiples, by another, Norcnote. Under these circumstances, neither the agreement between Norcnote and Printsiples' creditors nor the stock transfer can be construed as triggering a default under the lease.

The purpose of paragraph 16(a) was to protect the landlord from any losses which it might sustain from tenant's insolvency, should such a contingency arise. In that regard, the clause in question, which carries the block-letter caption of "Bankruptcy", expressly enables the landlord to cancel the lease upon the commencement of formal bankruptcy proceedings. The paragraph also refers to the tenant's entering into an "arrangement" as providing additional authority for termination. Unfortunately, the clause itself offers no assistance in ascertaining the type of arrangement foreseen by its drafter. While it is unclear whether paragraph 16(a) contemplated anything other than an insolvency proceeding, it would appear highly unlikely that actions which have the ultimate result of transforming a struggling corporation into one which is viable and capable of meeting its obligations can be deemed to constitute the sort of "arrangement" intended by paragraph 16(a). However, if there is an inherent uncertainty in the lease as to the meaning of "arrangement", any ambiguity should be resolved in favor of the tenant since it was the landlord who prepared the contested clause. (*Taylor v United States Cas. Co.*, 269 NY 360.) In

fact, if the clause were to be literally construed, it could conceivably prohibit common business practices, such as rescheduling payment deadlines, rearranging credit lines or seeking discounts for prompt payments.

The defendants' position is that enforcement of paragraph 16(a) of the lease is barred by the public policy of the United States, as expressed in the Bankruptcy Act of 1978 (US Code, tit 11, § 365, subd [e], par [1]), which states that:

"Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —

"(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

"(B) the commencement of a case under this title; or

"(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."

According to the dissenting opinion, section 365 (subd [e], par [1]) of the Bankruptcy Act of 1978 pertains only to an executory contract or unexpired lease in instances arising "after the commencement of the case", and, consequently, that statute is not applicable where, as in the case here, no proceeding in bankruptcy has been instituted. Although section 365 (subd [e], par [1]) does envision the existence of a bankruptcy proceeding, this in no way negates the fact that Congress, as a statement of public policy, intended that an executory contract or unexpired lease not be terminated solely because of a lease forfeiture provision. If such a clause is not to be given effect after the commencement of a bankruptcy proceeding, there can be even less justification for doing so in the absence of a proceeding. Therefore, if Printsiples had merely filed a petition for bankruptcy and everything else had remained the same, plaintiff would have been precluded from asserting the covenant at issue. The interpretation urged by the

landlord would have the undesirable result of forcing financially troubled tenants into a formal bankruptcy proceeding rather than negotiating an accommodation which is mutually beneficial to the parties concerned. Sound public policy should encourage financially troubled businesses to devise means of staying in business, not assist them over the brink. This is particularly the situation where the lease provision which the landlord is seeking to apply is ambiguous, and accordingly the court should not strain to interpret the lease in such a manner as would create a forfeiture.

The law is well settled that equity does not favor forfeitures. (See *Fifty States Mgt. Corp v Pioneer Auto Parks*, 46 NY2d 573; *J.N.A. Realty Corp. v Cross Bay Chelsea*, 42 NY2d 392.) The record does not reveal any actual harm suffered by the landlord as a result of Printsiples' financial difficulties, whereas a forfeiture in this case would assuredly operate to the detriment of the defendants, especially to that of the subtenant Futterman, who has expended in excess of $80,000 in connection with the move to, and utilization of, its current premises. Other than accepting the agreement between its creditors and Norcnote Associates, Printsiples is not claimed to have failed to perform any of the terms of its lease with plaintiff. Nor is there any allegation that the subtenant, Futterman-Schlang Industries, Ltd., was ever in default. In addition, the rent was paid regularly and on time. The landlord was, therefore, not damaged and would, in all likelihood, allow Futterman to remain in possession at a higher rental. This appears simply to be a situation where the plaintiff, seeking to obtain a greater return on its property, has focused attention on paragraph 16(a) as a means of canceling the lease. Therefore, Special Term properly denied the plaintiff's motion for summary judgment, but should have granted summary judgment to defendant.

Order of the Supreme Court, New York County (BLYN, J.), entered on June 15, 1981, which denied plaintiff's motion for partial summary judgment and denied the cross motion by defendant Futterman-Schlang Industries, Ltd. for summary judgment, should be modified on the law, with costs and disbursements, to the extent of granting the

defendant's cross motion for summary judgment dismissing the complaint, and otherwise affirmed.

The order of said court entered on December 28, 1981 which denied plaintiff's motion for renewal should be affirmed, without costs and without disbursements.

SULLIVAN, J. (dissenting). In this ejectment action to recover possession of demised premises both the landlord and subtenant appeal from the denial of their respective motions for summary judgment. The material facts are not in dispute.

On September 9, 1975 plaintiff leased the entire 16th floor of 151 West 40th Street to defendant Printsiples for use and occupancy as an executive and sales office, as well as a showroom for the sale of textiles, for a 10-year term commencing October 1, 1975 at an annual rental of $18,000. On August 1, 1978 Printsiples, with plaintiff's consent, entered into a sublease with defendant Futterman for a term ending one day before the expiration of the main lease, and at the same annual rental. The sublease was expressly made subject and subordinate to all of the terms and conditions of the main lease, the terms of which were deemed incorporated into the sublease. Futterman is now in possession.

Paragraph 16(a) of the main lease, which grants the landlord the option of canceling and terminating the lease upon the happening of any one of a number of events relating to the tenant's financial responsibility, states: "If at the date fixed as the commencement of the term of this lease or if at any time during the term hereby demised there shall be filed by or against Tenant in any court pursuant to any statute either of the United States or of any state, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property, and within 60 days thereof, Tenant fails to secure a dismissal thereof, or if Tenant makes an assignment for the benefit of creditors or petition for *or enter into an arrangement,* this lease, at the option of Landlord, exercised within a reasonable time after notice of the happening of any one or more of such events, may be cancelled and terminated by written notice to the Tenant". (Emphasis added.)

In the spring of 1980 plaintiff became aware that Printsiples was experiencing serious financial problems. Apparently it was not paying its debts as they became due, and a creditors' committee had been formed. Financial data compiled by Printsiples' own accounting firm for the period of November, 1979 through February, 1980 indicated that it was insolvent. Its unsecured trade debt was approximately $3,000,000. No sales of any significance were projected for the first half of 1980. Efforts by the committee to find a bidder for its unencumbered assets were unsuccessful.

After the committee had requested that it do so but before Printsiples could undertake an orderly liquidation of its assets, Printsiples and the committee were approached by a third party, Norcnote Associates, with an offer to purchase, on appropriate terms, the unsecured creditors' claims. Thereafter on April 30, 1980 Norcnote submitted a written proposal, to which Printsiples agreed to be bound,[1] to purchase the claims of Printsiples' unsecured creditors for 16.5% of the face value thereof if 95% of the unsecured creditors agreed to assign their claims, and Printsiples' shareholders agreed to sell their stock to Norcnote. By the end of June, 1980 at least 95% of Printsiples' unsecured creditors had accepted Norcnote's offer and Printsiples' shareholders had agreed to sell their stock to Norcnote. Learning of these developments plaintiff, by notice dated July 8, 1980, advised both Printsiples and Futterman of its election to cancel and terminate the lease pursuant to paragraph 16(a) thereof, and demanded immediate possession of the premises. This action followed.

Despite Printsiples' concession that its debt was "transferred in full to a third-party entity [Norcnote]", Special Term found a "question whether the agreement ever was effectuated" so as "to trigger forfeiture". Neither defendant ever challenged that the creditors had, in fact, accepted Norcnote's offer. Their contention was that the agreement between Norcnote and Printsiples' creditors was not an "arrangement", which would trigger forfeiture under the bankruptcy clause of the lease; that, even if it was, enforce-

---

1. The proposal was signed by Herbert Cron as a general partner of Norcnote Associates. Printsiples' agreement to be bound by Norcnote's offer was signed by the same Herbert Cron as vice-president of Printsiples.

ment of the clause would violate public policy; and, finally, that equitable considerations precluded a finding of automatic forfeiture. None of these arguments has merit and plaintiff should have been awarded summary judgment.

An arrangement with creditors, a recognized insolvency device, is "[a] plan of a debtor for the settlement, satisfaction, or extension of the time of payment of his debts." (Black's Law Dictionary [5th ed, 1979], p 100.) As analysis of the triparty transaction between Printsiples, its creditors and Norcnote shows, such an arrangement was entered into here. Crucial to any such analysis is an examination of the purpose and obvious effect of the parties' agreement.

By executing an "Acceptance and Assignment of Claim", the instrument by which a creditor accepted Norcnote's offer and which would become operative only upon acceptance by 95% of the unsecured creditors, each creditor acknowledged that it accepted 16.5% of the amount of its claim "in full and final settlement and satisfaction of all its claims against [Printsiples]". Thus, the agreement allowed the creditors to salvage some part of their claims against an insolvent debtor, and the hopelessly insolvent Printsiples disposed of virtually all of its debt by an across-the-board third-party payment to its creditors, pursuant to an agreement to which it gave its consent and, as part of which, its shareholders agreed to sell their stock to Norcnote. Transfer of the stock was an important aspect of the transaction since it gave Norcnote ownership of the debtor, Printsiples. As its proposal to the committee makes clear, the continuance of Printsiples "as a going business" was a major concern to Norcnote. The proposal provided that even before settlement of the creditors' claims, upon Norcnote's payment of a security deposit, the Committee was to "permit [Printsiples] to continue its operations". Not without significance is the fact that Herbert Cron, one of the general partners of Norcnote, a limited partnership, was also a vice-president of Printsiples.[2]

Although Norcnote purported to take an assignment of the creditors' claims under the "Acceptance and Assign-

---

2. The creditors were expressly advised that one or more of the principals of Printsiples might have a minority interest in Norcnote, a partnership in the process of organization.

ment of Claim", once the debt was fully and finally satisfied, as it was by the very terms of that instrument when 95% of the unsecured creditors accepted Norcnote's offer, the claims were extinguished and the creditors had nothing to assign. (See *Rosenthal v Conditional Purchase Co.,* 40 AD2d 375, 377, affd 33 NY2d 983.) An assignee's rights are measured by those of his assignor and, generally, the assignee acquires no greater right than his assignor. (*Meeder v Provident Sav. Life Assur. Soc. of N. Y.,* 171 NY 432.) Thus, by this tripartite arrangement the debt was satisfied, liquidation avoided, and the debtor permitted to continue its business.

The transaction involved here has all the indicia of a composition with creditors since the creditors agreed to discharge their claims in consideration of a partial payment. (See *Beck v Witteman Bros.,* 185 App Div 643, 645.) "Such an agreement, if entered into by a debtor with a number of his creditors, each acting on the faith of the engagement of the others, will be binding upon them, for each in that case has the undertaking of the rest as a consideration for his own undertaking." (*White v Kuntz,* 107 NY 518, 524.) It matters not that the payment was to be made by a third party as long as the claims were being satisfied. Nor can it be seriously argued that Printsiples was not a party to the agreement between Norcnote and the creditors.

Even if, however, as Printsiples argues, the triparty transaction amounts to no more than a mere transfer of Printsiples' entire debt for collection to a third party, Norcnote, the time for payment of the debt was nonetheless extended since at the time of the assignment, the debt was past due. Instead of suing on the claims, Norcnote acquired all of Printsiples' stock, thereby becoming both creditor and owner of the debtor. Thus, whether viewed as a composition with creditors or an extension of the time of payment of the debt, the transaction falls within the definition of the term arrangement as used in paragraph 16(a) of the lease.

Insolvency clauses which parties voluntarily include in their agreements are enforceable. (See, generally, *Alloyd Gen. Corp. v Building Leasing Corp.,* 361 F2d 359; *Sinclair*

*Contr. Co. v Walzer,* 179 Misc 228.) Under paragraph .16(a) of the lease an arrangement with creditors triggers forfeiture in the same manner as a petition in bankruptcy or an assignment for the benefit of creditors. Although, under the new bankruptcy statutes, as discussed *infra,* formal bankruptcy might bar enforcement of the forfeiture provision, the rule of law which previously compelled forfeiture in bankruptcy situations should apply with equal vigor to an arrangement.

In *Gillette Bros. v Aristocrat Rest.* (239 NY 87) provision was made for termination of the lease if "proceedings in bankruptcy shall be instituted by or against the tenant". The court held that not even possession by another could forestall the landlord's right to terminate the lease upon the original tenant's bankruptcy. The court stated (pp 91-92): "The continuing liability of the tenant for rent after assignment not only follows as a matter of law because of the covenant in the lease but it is expressed * * * The lessor * * * [o]bviously [intended] * * * to secure a responsible tenant. Naturally, therefore, it might provide for the forfeiture of the lease if such tenant became bankrupt."

The case of *W.F.M. Rest. v Austern* (35 NY2d 610) is instructive. There, a landlord had exercised its option to terminate a lease on the basis of the filing of an involuntary petition in bankruptcy against the tenant. The petition was dismissed on a technical defect, a disposition in which the tenant's creditors acquiesced since apparently a settlement had been reached whereby the creditors would receive 20% on their claims. The tenant argued that the lease could not be terminated, since it had been adjudicated bankrupt. In affirming the grant of summary judgment to the landlord the court reasoned (p 615): "The dismissal of the bankruptcy proceedings, on the merits it is true, did not negate the serious condition of the enterprise making its future uncertain. There was no doubt, and indeed it was asserted by the sellers, that they would try to sell the enterprise. The 20% composition with the unsecured creditors was indicative of the distress surrounding the enterprise. There was therefore ample confirmation that the filing of the bankruptcy petition was justified and not the product of causeless, malicious, or collusive behav-

ior by the creditor petitioners. In such circumstances for a court in the name of equity to have undone the contractual provision giving landlords the right to terminate the lease would have been an indiscretion which could not be sustained." By the same reasoning Printsiples' arrangement with its creditors was a clear indication of insolvency, which triggered the lease provision authorizing the landlord to terminate.

Defendants also argue that the public policy of the United States, as embodied in the Bankruptcy Code of 1978, bars enforcement of any lease forfeiture clause based upon either the insolvency or financial condition of the tenant. Section 365 (subd [e], par [1]) of the code states:

"Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —

"(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

"(B) the commencement of a case under this title; or

"(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."

By its own terms, section 365 (subd [e], par [1]) applies to an executory contract or unexpired lease in situations arising only "after the commencement of the case". Subdivision (31) of section 101 of the code refers to a case as a proceeding commenced by the filing of a petition under sections 301, 302, 303 or 304 thereof. Since a proceeding in bankruptcy has not been commenced by or against Printsiples section 365 (subd [e], par [1]) is not applicable here. Furthermore, defendants fail to demonstrate how the public policy implications of section 365 (subd [e], par [1]), even if otherwise applicable, would be served in this case by avoidance of the lease forfeiture provision. The Bankruptcy Code is founded on principles designed to foster the

rehabilitation of a distressed debtor. (*Atlantic Coast Line R. R. Co. v St. Joe Paper Co.*, 216 F2d 832, cert den 348 US 963.) This purpose is hardly served by preserving a tenancy where the distressed debtor is out of possession and occupying other, more suitable premises; its sole reversionary interest is the one day hiatus between the expiration of the sublease and the main lease; and the sublease provides for a rental in the same amount as its obligation under the main lease. Not even Futterman's eviction would give rise to liability on Printsiples' part since the sublease was expressly made subject to the terms and conditions of the main lease, the terms of which were deemed incorporated into the sublease.

Moreover, where a debtor has chosen not to petition for bankruptcy, with the concomitant restrictions that bankruptcy would entail, it cannot invoke the protections of the Bankruptcy Code. Otherwise, a creditor, such as a landlord, would be placed in the unenviable position of being unable to invoke either his contractual remedies or the protections afforded by statute.

Finally, defendants argue that the equities favor them since plaintiff would not be harmed if the lease were to remain in effect, while the subtenant, Futterman, would be damaged in the sum of $80,000. This figure represents, allegedly, the aggregate of its moving expenses, the cost of advertising its present location, the expense of installing fixtures and the increased rental for comparable rental space. Parenthetically, it should be noted that any alterations were undertaken without plaintiff's written consent, as required by the lease. While plaintiff consented to the sublet of the premises, Printsiples remained liable on the lease. Printsiples' insolvency deprived plaintiff of the security of a financially viable tenant to pay the rent in the event of Futterman's default; as a result of Printsiples' economic condition plaintiff is now at a substantially greater risk. It is no answer to urge, as do defendants, that since Futterman, which is solvent, pays the rent timely each month through Printsiples, plaintiff has suffered no pecuniary loss. Even if Printsiples were still in possession and paying the rent timely its insolvency would trigger forfeiture, and since plaintiff's contractual relationship is

with Printsiples, not Futterman, it is Printsiples' solvency, not Futterman's, that matters in the event of default.

The courts have enforced forfeiture clauses where the value of the property has been enhanced by alterations which the lease prohibited (see *Freehold Invs. v Richstone,* 34 NY2d 612) and even where termination might cause the tenant fiscal hardship (see *Fifty States Mgt. Corp. v Pioneer Auto Parks,* 46 NY2d 573). As the court noted in *Fifty States (supra,* p 577), "[a]bsent some element of fraud, exploitive overreaching or unconscionable conduct on the part of the landlord to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties."

Accordingly, the order of Special Term denying the respective motions for summary judgment should be modified to grant summary judgment to plaintiff.

KUPFERMAN, J. P., and ALEXANDER, J., concur with MILONAS, J.; SULLIVAN and KASSAL, JJ., dissent in an opinion by SULLIVAN, J.

Order, Supreme Court, New York County, entered on June 15, 1981, modified, on the law, to the extent of granting the defendant-appellant-respondent's cross motion for summary judgment dismissing the complaint, and otherwise affirmed. Defendant-appellant-respondent shall recover of plaintiff-respondent-appellant one bill of $75 costs and disbursements of these appeals. Order, Supreme Court, New York County, entered on December 28, 1981, affirmed, without costs and without disbursements.